UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                    CASE NO. 22-cr-00072

VERSUS                                      JUDGE ELIZABETH E. FOOTE

CHRISTIAN D PRICE (01)                      MAGISTRATE JUDGE HORNSBY
DEVON CHARLES PRICE (02)

## REPORT AND RECOMMENDATION

**Introduction**

In response to an alarming increase in gun crimes in the Shreveport area, law enforcement officers, including officers with the Louisiana Division of Probation and Parole, conducted a residence check on potentially dangerous individuals who were placed on probation or parole. Siblings Christian Price ("Christian") and Devon Charles Price ("Devon") were both felons on probation. Officers conducted a residence check at their home and found guns and ammunition. Christian and Devon were each charged with one count of felon in possession of a firearm.

Before the court are Defendants' Motions to Suppress (Docs. 32 & 35). Defendants argue that the search of their residence was in violation of the Fourth Amendment because it was not supported by reasonable suspicion. For the reasons that follow, it is recommended that the motions be denied.

**Relevant Facts**

A hearing was held on the motions to suppress. The following facts were established. Louisiana Probation and Parole ("LPP") officers coordinated with law

enforcement agencies to perform residence checks on offenders with a history of violent crimes or gun crimes. This coordinated effort was called "Operation Blue Night."[1]  Doc. 42, Tr. 6. During the checks, the officers would perform a cursory walk through the residence to see if there was any contraband, such as guns or ammunition, in plain sight. Tr. 6-7. Such residence checks are a regular part of probation. Probation officers will perform a residence check to verify that a probationer is living at a particular residence by walking around to make sure that it looks like someone is actually living at the residence. Tr. 7.

Christian Price was on probation for attempted aggravated burglary, and Devon Price was on probation for illegal possession of stolen things. Gov. Ex. 1 and 2. As part of their probation, Defendants consented in writing to unscheduled residence checks. Tr. 9-10; Govt. Ex. 1 and 2, Condition 13. Because of their violent criminal histories, Defendants were placed on the list for Operation Blue Night. Tr. 11.

On June 11, 2021, LPP officers David Kerr and Melissa Johnson, along with officers with the Office of Juvenile Justice, went to 3203 Milton Street where both Defendants reside. Tr. 11-12. Defendants' mother, Betty Price ("Ms. Price"), is the owner of the house. Tr. 12. The front of the house is on a steep incline, so the officers approached

---

[1] There is some confusion regarding the name of the operation. The Government's first brief refers to the operation as "Operation Blue Light." The suppression transcript, Christian Price's brief, and the Government's second brief refer to it as "Operation Blue Night." Docs. 42, 43, & 46. Devon Price's brief uses "Operation Blue Knight," but acknowledges that the transcript uses the spelling "Night." Doc. 44, fn. 1.

from the rear of the house.  The back door to the house was open.  Ms. Price came to the door, and the officers announced themselves.  Tr. 12-13.

The agents told Ms. Price their purpose for being there, and they her asked if Defendants were at the house.  Ms. Price said that they were both in the back of the house cleaning their bedrooms.  She then turned and walked down the hall toward Defendants' rooms.  Three or four officers followed Ms. Price, and the rest stayed outside to watch the perimeter of the house.  Tr. 14.

The agents reached Christian's bedroom and saw Christian cleaning his room.  Devon came down the hallway, and the agents told Christian and Devon that they were doing a residence check.  Tr. 15.  The agents asked Defendants to wait in the living room for officer safety.  They were not handcuffed.  Kerr stayed with them in the living room while Johnson and the other agents performed the residence check.  Tr. 40.  The agents walked around Defendants' bedrooms to look for any contraband that was in plain view as well as to look for items that would indicate that it was Defendants' actual residence.  Tr. 40. Both Defendants had been previously notified in writing that they could not possess firearms or ammunition.  Gov. Ex. 3 and 4.

A dresser drawer was open in Christian's bedroom, and Johnson saw a small scale and a loaded magazine in the drawer.  Tr. 40-41.  The presence of the contraband ammunition and drug paraphernalia gave the agents reasonable suspicion to perform a search.  They found an unloaded gun with an extended magazine and a Tommy-style drum magazine underneath Christian's bed.  Tr. 42.

The agents then walked through Devon's room.  They saw some small baggies scattered throughout the room, and one baggy contained what appeared to be marijuana. Tr. 42-43.  The agents then performed a search of the room.  They found a loaded .40 caliber handgun in a shoe box in the closet.  Tr. 43.

**The Motions to Suppress**

Defendants' motions argue that the search of the residence was unlawful because (1) the probation check was an unlawful ruse for a multi-agency police operation, (2) there was no reasonable suspicion for the warrantless search, and (3) no one consented to the search.  Defendants argue that all evidence and statements seized as a result of the search should be suppressed.

**Analysis**

**A. Legality of the Residence Check**

It is well settled that parolees and probationers "do not enjoy the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special restrictions."  Griffin v. Wisconsin, 483 U.S. 868, 874 (1987).  On the continuum of state-imposed punishments, "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."  Samson v. California, 547 U.S. 843, 850 (2006).

"A probation or parole officer may not use his authority as a subterfuge to help another police agency that desires to conduct a search in connection with a criminal investigation, but lacks probable cause."  State v. Spriggs, 271 So.3d 320 (La. App. 5th Cir. 2019).  But police and parole officers are entitled to work together to achieve their

objectives.  U. S. v. Harper, 928 F.2d 894, 897 (9th Cir. 1991).  "The proper question is whether the parole officer used her authority to help the police evade the fourth amendment's warrant requirement or whether the parole officer cooperated with the police to achieve her own legitimate objectives."  Id.

"Home visits … do not constitute as invasive a burden on a probationer's expectations of privacy as does a search."  U.S. v. LeBlanc, 490 F.3d 361, 368-69 (5th Cir. 2007).  Therefore, home visits do not require a showing of reasonable suspicion.  Id. at 369.  In Leblanc, the Fifth Circuit held that a probation officer who visited a probationer's home, asked to "look around," and walked around the probationer's house did not cross the line from a home visit to a search requiring proof of reasonable suspicion.  Id.

Operation Blue Night was a concerted action between LPP officers and law enforcement.  The task force was concerned with getting dangerous weapons off the street due to a rise in gun crime.  Importantly, there was no ongoing criminal investigation targeting either Defendant at the time of the operation.  LPP did not perform the check based on any tip from law enforcement that Defendants were engaged in any criminal activity.  Instead, LPP created a list of individuals on probation or parole who had been convicted of dangerous crimes.  And the officers merely conducted a residence check, not a search, until they found reasonable suspicion of criminal activity.  The LPP agents were cooperating with the police to achieve LLP's legitimate objectives of supervising probationers for purposes of the community's protection.  See LeBlanc, 490 F.3d at 365-66.  There was no ruse on the part of LLP to help the police avoid the necessity of a warrant to search any particular person's residence.

A somewhat similar situation was addressed by the Louisiana Supreme Court in State v. Julien, 234 So.3d 21 (La. 2017). That case involved Operation VR12, the U.S. Marshals' violence reduction operation. As part of that operation, two LPP agents and officers from the U.S. Marshals conducted a compliance check at Mr. Julien's home. When someone opened the door, the officers entered and were directed to Julien's room, where they found Julien in bed with a female companion. The agents handcuffed Julien and the companion and escorted them from the room. While conducting a protective sweep of the room, the agents saw live ammunition on a windowsill. The agents then conducted a search of the room and discovered a firearm in the drawer of the nightstand.

Julien filed a motion to suppress the evidence seized in the search. The lower court granted the motion, holding that the officers who conducted the search did not have the ability to conduct a warrantless search, noting that the probation officers were not assigned to Julien's case as mandated by La. C. Cr. P. art. 895(A)(13)(a). The court of appeal denied the state's writ application. The court explained that, under Louisiana law, any probation officer could reasonably conduct a compliance check pursuant to La. C. Cr. P. art. 895(A)(4), but the agents did more than just a compliance check when they entered the bedroom and handcuffed Julien and escorted him out of the room before seeing the ammunition on the windowsill.

The Louisiana Supreme Court upheld the appellate court's ruling. The court held that the officers' actions "went far beyond a routine check" because they handcuffed Julien immediately and removed him from the room. In this case, however, the agents asked Defendants to wait in the living room while the agents "walked towards the room just to

do a quick survey of the area" to look for contraband in plain sight as well as to look for "personal items that would indicate it was their actual residence." Tr. 40. This plain view survey was in line with a probationary home visit and did not rise to the level of a search as in <u>Julien</u>.

### B. Consent to Enter

Additionally, Ms. Price consented to the officers entering her home. Johnson testified that, upon the officers' arrival at Defendants' residence, Ms. Price invited the officers into the house by saying, "Come on this way." Tr. 37. Kerr testified that he did not hear Ms. Price invite them in, but she indicated with her body language for the officers to come in the house. Tr. 13. Ms. Price testified that she did not invite the officers into the house, and they did not ask for permission to enter. Tr. 59-60. She did not ask the officers if they had a warrant and did not ask them to leave. She walked down the hall and the officers followed her, and she conversed with them as they were walking toward Defendants' adjacent bedrooms. Tr. 64-65.

The court does not find Ms. Price's testimony to be credible. She exaggerated the number of agents at the house, claiming that there were 20 agents searching her house, when there were fewer than ten. She claimed that the agents searched the house for two or three hours, but she could not know firsthand the total time the agents were there because she left the house to go to work while the agents were still at the scene.

The court finds the testimony of the agents to be credible. Kerr and Johnson both observed body language indicating that they could come in the house. And Ms. Price testified that she was speaking with the officers as they walked down the hall and that she

did not ask them to leave.  This testimony is consistent with Kerr's testimony that Ms. Price's body language indicated consent to enter the home.  The court finds that Ms. Price consented to the agents entering her home.

### C.  Reasonable Suspicion

The Supreme Court has held that a warrantless non-consensual search of a probationer based on reasonable suspicion does not violate the Fourth Amendment.  United States v. Knights, 534 U.S. 112, 118-119 (2001)(upholding a warrantless non-consensual search of a probationer's home based on reasonable suspicion when the probationer agreed to searches as a condition of probation); United States v. Keith, 375 F.3d 346, 347 (5th Cir. 2004) (upholding a warrantless, non-consensual search of a probationer's home based on reasonable suspicion when neither a state regulation nor a condition of probation specifically authorized the search).

The officers and agents entered Defendants' home to perform a legitimate residence check pursuant to Defendants' terms of probation.  While performing the check, the agents saw contraband, including a loaded magazine, ammunition, and suspected marijuana, in plain view.  At that point, the agents had reasonable suspicion that Defendants were engaged in criminal activity.  Therefore, the search of Defendants' bedrooms did not violate the Fourth Amendment.

Accordingly,

It is recommended that Defendants' Motions to Suppress (Docs. 32 & 35) be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 31st day of October, 2022.

Mark L. Hornsby
U.S. Magistrate Judge